**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Doretta Butler-Long, Employee, Claimant, Appellant,

v.

ITW Labels, Employer, and American Zurich Insurance Company/Zurich North America c/o Broadspire, Carrier, Respondents.

Appellate Case No. 2017-001535

———————

Appeal From The Workers' Compensation Commission

———————

Opinion No. 2023-UP-291
Heard February 3, 2020 – Filed August 9, 2023

———————

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

———————

Stephen Benjamin Samuels, of Samuels Law Firm, LLC, of Columbia, for Appellant.

Jason Wendell Lockhart, of McAngus Goudelock & Courie, LLC, of Columbia, and Helen F. Hiser, of McAngus Goudelock & Courie, LLC, of Mount Pleasant, both for Respondents.

———————

**MCDONALD, J.:**  Doretta Butler-Long (Claimant) appeals the denial of her workers' compensation claim, arguing the Appellate Panel of the South Carolina Workers' Compensation Commission (the Appellate Panel) erred in (1) finding she failed to meet her burden of proving an injury by accident or, alternatively, a repetitive trauma injury and (2) disregarding her treating physicians' medical opinions that her injury was work-related when there was no expert medical opinion to the contrary.  We affirm in part, reverse in part, and remand for a calculation of benefits.

**Facts and Procedural History**

In September 1999, Claimant began working as a laminator at ITW Labels (Employer), a printing company providing signs and labels of various sizes.  By all reports, Claimant was a model employee—a December 2011 performance appraisal notes, "Doretta has proven to be the most valuable Laminator in the company.  She can get out the most product in the shortest amount of time."  Claimant's job included retrieving heavy materials from a warehouse, lifting heavy boxes containing rolls of printing material to process through a laminating machine, running the machinery, and inspecting the final product.  The size of the rolls depended on which laminator machine she was running, but the rolls of adhesive could weigh up to 300 pounds; some required two people to lift them.  At one time, Claimant and the other laminators lifted these rolls by hand, but "they eventually got a lift."

While working on Wednesday, April 11, 2012, Claimant began experiencing pain on her right side, but she attempted to continue working the remainder of that week.  When asked at the hearing how she initially was hurt, Claimant explained, "From lifting the rolls and from the repetitive [sic] of just sending it through the machine from the rolls.  A lot of the rolls [were] heavy, but I had to get my job done."  Within two to three days, however, her fingers "started going numb."  That Friday night, April 13, Claimant went to the emergency room at Providence Hospital, where she described a throbbing pain in her right shoulder and forearm that worsened with movement.  The emergency room doctors took X-rays of her right arm, shoulder, and chest; prescribed Percocet; and gave her a sling to wear.

The following Monday, Claimant told her supervisor she was unable to come to work, but she did not report a work-related injury at that time because she believed she had a slipped disc in her neck and was suffering from chest pain, which she did not attribute to her employment.  In the months following the onset of her pain, Claimant saw physicians and specialists who noted Claimant's symptoms were

confusing and abnormal; the doctors provided multiple possible diagnoses—initially, none were accurate. Unfortunately, the true cause of Claimant's pain—a rotator cuff injury—went undiagnosed for over two months. And, Claimant's partial rotator cuff tear was not discovered until her 2014 arthroscopic surgery, nearly two years after her injury at work.

Prior to *any* physician diagnosing a rotator cuff problem—much less the partial tear, Claimant saw several doctors. On April 17, Claimant went to the emergency room at Palmetto Health Richland, where the physician noted her symptoms were "[l]ikely secondary to muscle spasm as the patient had tense muscles" and instructed her to see her primary care physician. Claimant returned to Palmetto Health Richland on April 23 because the prescribed medication was not decreasing her pain. A cervical spine X-ray "showed degenerative joint disease as well as some signs consistent with muscle spasms"; the physician further noted Claimant would likely need an MRI if her symptoms persisted. One doctor ordered tests to rule out deep vein thrombosis and rhabdomyolysis.

On April 27, Dr. Mark Shaffer of the Palmetto Health Richland Family Medicine Center evaluated Claimant, noting her right "trapezius and paraspinal muscles [are] in marked spasm easily visible." He further observed Claimant held her arm in a guarded position and her right shoulder had a "markedly reduced" range of motion. Dr. Shaffer gave Claimant a Lidocaine injection and prescribed naproxen and Percocet. Dr. Shaffer reported, "Confusing [patient] with unusual exam but marked pain and [abnormal] findings. At least 2 pathologies present-neck spasm and some neuropathy affecting the [right] arm-likely brachial plexitis."

When Claimant returned to the Family Medicine Center on May 2, Dr. Simon Tanksley noted, "The context of the pain occurred not following a fall, not during sports and not in association with work." He indicated, "Patient asking for me to sign disability papers and refill Percocet Rx from ER. Very suspicious for malingering, will get MRI." A May 9 cervical MRI revealed "mild degenerative disc changes," and the MRI and X-ray of Claimant's right shoulder were "unremarkable." Dr. Tanksley reexamined Claimant on May 11, 2012; he prescribed her Percocet, an antidepressant, and naproxen and referred her to a neurosurgeon due to her bulging cervical disk and arm pain. That same day, Claimant applied for short-term disability benefits. Dr. Tanksley completed the accompanying attending physician statement and indicated it was "Unknown" whether Claimant's injury arose from her employment.

Claimant saw neurosurgeon Raymond Sweet on May 31; Dr. Sweet referred her to an orthopedic specialist because he did not find her problem to be neurological. On June 1, Claimant returned to the Family Medicine Center, where Dr. Tanksley described her appearance as depressed, sad, and tearful and referred her to an orthopedic surgeon. Orthopedic surgeon Andrew McGown evaluated Claimant's shoulder on June 11, noting, "1) Right shoulder pain. 2) Right rotator cuff tendonitis/bursitis. 3) Right questionable early adhesive capsulitis." He further described the onset of her pain as "Started with chest pain and generated to shoulder and fingers."[1]

Dr. Tanksley's record of a July 30 visit notes,

> Has been almost 4 months since start of right shoulder pain. Seeing sport med, Dr. [McGown] thinks is rotator cuff tendonitis, patient on second round of PT. I filled out FMLA paperwork, patient now asking how to get disability. Advised patient she will need Ortho[pedic] evaluation, then call Voc[ational] Rehab to start process. This is the last time I can give her work excuse.

As to the history of Claimant's present illness, Dr. Tanksley amended his prior opinion to note Claimant's "pain occurred 3 month(s). The context of the pain: occurred with movement, in association with work, not following a fall, not associated with cold weather, not associated with damp weather and not during sports."

After finding no relief through physical therapy, Claimant saw shoulder surgeon Christopher Mazoue on September 14. In his evaluation, Dr. Mazoue notes, "She, [I believe], works laminating furniture but cannot recall that her work actually caused this injury." Dr. Mazoue further stated, "Due to the chronicity of the symptoms, we will go ahead and get an MR arthrogram of the right shoulder." After a September 26 follow-up appointment, Dr. Mazoue reported Claimant's MR arthrogram revealed "some rotator cuff tendinosis, but the rotator cuff is still

---

[1] Dr. Sweet was the first physician to recognize a shoulder pathology. Claimant testified that after her visits to Dr. Sweet and Dr. McGown, she reported her work injury to Stacie Dash, a supervisor. She noted, "I told Stacie in the end of July when I found out for sure what was wrong with me. I told Stacie then what was wrong with me." Employer did not present evidence contradicting Claimant's report to Dash.

intact. . . . I think this is a very difficult problem. Ms. Butler certainly appears depressed. She is exhibiting pain and depression that are certainly out of proportion from what we see on exam or the MRI." Claimant had another follow-up appointment with Dr. Mazoue on November 28, during which he discussed surgery as an option. Unfortunately, Claimant declined to have surgery at that time; she later explained in her deposition that she could not afford the surgery and did not have health insurance.

On February 11, 2013, Claimant again visited Dr. Mazoue and reported the injections he had been administering provided her only one month of relief. Dr. Mazoue again discussed surgery with Claimant, noting, "At this point due to failure of nonoperative treatment we will proceed with a right shoulder arthroscopy with SCD, DCE, possible rotator cuff debridement versus repair and possibly biceps tenotomy versus tenodesis." Following an August 16, 2013 appointment, Dr. Mazoue reported, "[Claimant] returns today after cancelling her surgery 5 months ago for her R shoulder. . . . She is not interested in surgery due to financial reasons. She is here today to discuss other options."

Dr. Mazoue reevaluated Claimant on February 28, 2014, and performed the diagnostic arthroscopy under general anesthesia in April. The surgery revealed a partial thickness rotator cuff tear of the supraspinatus tendon. Once the cause of Claimant's ongoing shoulder/chest/arm pain was discovered, Dr. Mazoue was able to surgically repair the rotator cuff. At her appointments following the surgery, Claimant reported persistent pain on May 14, August 13, October 15, November 24, and December 29.

On January 20 or 26, 2015,[2] Dr. Mazoue reviewed Claimant's medical history and completed a questionnaire at the request of her attorney. In this document, Dr. Mazoue unequivocally opined Claimant's "right shoulder injury is most likely related to her activities as [a] laminator." In response to a question about the basis of his medical opinion, Dr. Mazoue added a handwritten note that his response was based on a "review of the records with regards to onset of pain and dysfunction and subsequent medical care."

Claimant filed a second Form 50 in 2016, alleging an April 2012 injury arising from her employment. Following a hearing, the Single Commissioner found

---

[2] Dr, Mazoue's handwriting is difficult to decipher as to the specific day, but whether he completed the questionnaire on the 20th or the 26th of January is not relevant to our analysis.

Claimant failed to meet her burden of proving a compensable injury arising from her employment either by accident or repetitive trauma. Claimant filed a Form 30 Notice of Appeal, and following a hearing, the Appellate Panel affirmed the Single Commissioner.

**Standard of Review**

The Administrative Procedures Act (APA) establishes this court's standard of review for the Appellate Panel's decisions. *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981). Under the APA, this court may reverse or modify the Appellate Panel's decision when the substantial rights of the appellant have been prejudiced because "the decision is affected by an error of law or is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." *Transp. Ins. Co. & Flagstar Corp. v. S.C. Second Injury Fund*, 389 S.C. 422, 427, 699 S.E.2d 687, 689–90 (2010); S.C. Code Ann. §1-23-380(5)(d)–(e) (Supp. 2022). We must affirm the Appellate Panel's factual findings if they are supported by substantial evidence not affected by an error of law.

**Law and Analysis**

While we agree with the Appellate Panel that the record does not support Claimant's alternative theory of repetitive injury, we disagree with the finding that Claimant failed to meet her compensability burden under section 42-1-160 of the South Carolina Code (2015), which addresses injury by accident in the scope of employment. Claimant persuasively argues that she proved she suffered a work-related injury on April 11, 2012, and that the Appellate Panel erroneously disregarded the only expert medical evidence addressing causation: Dr. Mazoue's medical questionnaire and deposition testimony and Dr. Tanksley's July 30 record amending his conclusion to note the work connection for Claimant's shoulder pain. Much like Claimant, it appears Dr. Tanksley only recognized the connection between Claimant's work and her injury once a rotator cuff problem was diagnosed.

Despite the lack of any medical opinion challenging Dr. Mazoue's expert finding, both the Single Commissioner and the Appellate Panel found Claimant's injury was not compensable, dismissing Dr. Mazoue's opinion because "his conclusion as to the work nexus does not come while he was treating her." Specifically, the Appellate Panel concluded:

33. Based on the substantial evidence, including Claimant's testimony and the medical records of Claimant, we find that Dr. Mazoue has opined that those issues are work-related. That being said, Dr. Mazoue's conclusion as to the work nexus does not come while he is actively treating the Claimant. It comes sometime later in a medical questionnaire. (APA p. 111). As such, we cannot give the opinion the weight we would normally give such opinion offered contemporaneously to the alleged date of injury.

Not only is this finding factually inaccurate and, thus, not supported by the substantial evidence in the record, we find it legally erroneous as well. First, the not "actively treating" finding is not supported by the substantial evidence in the record because Dr. Mazoue gave his uncontradicted opinion less than one month after Claimant's fifth post-surgical appointment. She underwent shoulder surgery—where the rotator cuff tear was finally discovered—on April 1, 2014. Following a May post-surgical appointment, Claimant again saw Dr. Mazoue on August 13, October 15, November 24, and December 29. He completed the medical questionnaire less than thirty days later, on either January 20 or 26, 2015. Reviewing this chronology, we find no support in the record for the Appellate Panel's decision to disregard this uncontradicted opinion on the basis that Dr. Mazoue's written opinion "does not come while he is actively treating the Claimant." As both the Single Commissioner and the Appellate Panel properly recognized, Dr. Mazoue confirmed in his subsequent deposition that his opinion connecting Claimant's right shoulder injury to her work lifting heavy laminate sheets was given to a reasonable degree of medical certainty.[3]

The Appellate Panel again demonstrated its misunderstanding of the substantial evidence in the record when it found Dr. Mazoue provided the *only* evidence of a work nexus for Claimant's injury. This is factually erroneous because Dr. Tanksley revised his "Unknown" finding after the rotator cuff pathology was discovered. Dr. Tanksley was initially unable to recognize the relationship to Claimant's work until he learned Claimant's continuing pain was, in fact, the result

---

[3] The Appellate Panel's discounting of Dr. Mazoue's questionnaire and deposition testimony on such a basis is further troubling in light of Claimant's own testimony that she could not continue to see Dr. Mazoue after her December 29 appointment because she could not afford to pay her balance with his medical practice.

of a rotator cuff injury—and not simply cervical radiculopathy. Once Dr. Tanksley learned this, he corrected his initial "Unknown" and "not in association with work" notations to report "the context of the pain occurred with movement, in association with work." Again, the Appellate Panel ignored this evidence in the record despite the absence of any expert medical opinion to the contrary.

The Appellate Panel's problematic rejection of these two medical opinions is compounded by the fact that Dr. Tanksley and Dr. Mazoue were the only two physicians who actually followed and treated Claimant. Dr. Tanksley followed Claimant from May 2 through July 30, 2012; Dr. Mazoue followed her from September 14, 2012, through December 29, 2014. Instead the Appellate Panel appears to have placed greater weight on the medical records of physicians who saw and perhaps evaluated the Claimant once or twice but did not otherwise treat her, other than to perhaps give her pain medicine. None of these other doctors addressed the actual cause of Claimant's injury or opined as to whether it was (or was not) work-related.

Employer's argument that "the medical records don't support" Dr. Mazoue's expert medical opinion connecting Claimant's injury to her work ultimately fails in light of a full review of the record. Claimant's medical records demonstrate the nexus of her injury to her work: the time of the onset of the shoulder/chest/arm pain connects it to her work, and there is no evidence in the record to support a finding that such a rotator cuff injury can arise idiopathically. Employer could have presented its own expert to challenge Dr. Mazoue, or it could have successfully cross-examined him to demonstrate the error of his conclusions. *See, e.g.*, *Clark v. Philips Elecs./Shakespeare*, 433 S.C. 186, 193–94, 857 S.E.2d 378, 381 (Ct. App. 2021) (reversing and finding clear error where Appellate Panel offered no medical testimony to support its conclusion that claimant's "doctors' opinions were based upon 'self-serving assertions of the claimant'"). Neither occurred here. As Claimant's varying—and erroneous—attempted diagnoses demonstrate, the mechanism of her injury was complicated, and Employer correctly notes she initially failed to attribute it to her work as a laminator. [4] But, the findings of both

---

[4] We find the short-term disability form Claimant's husband helped her complete did not provide a basis for the Appellate Panel to disregard Dr. Mazoue's expert testimony. On the form, "No" was checked in the response to the question "Is this condition work-related?" However, our supreme court rejected such as a basis for denying compensability in *Massey* when the majority agreed with the circuit court's finding that "evidence supporting a compensable injury is overwhelming." *See Massey v. W.R. Grace & Co.*, 286 S.C. 434, 436, 334 S.E.2d 122, 122 (1985)

the Single Commissioner and the Appellate Panel improperly penalized Claimant for not understanding the genesis of her injury—an injury for which several physicians provided a variety of clinical impressions and misdiagnoses until Dr. Mazoue finally discovered the rotator cuff tear during surgery.[5]  This was error—both factually and as a matter of law.

"Workers' compensation law is to be liberally construed in favor of coverage in order to serve the beneficent purpose of the Workers' Compensation Act; only exceptions and restrictions on coverage are to be strictly construed."  *Nicholson v. S.C. Dep't of Soc. Servs.*, 411 S.C. 381, 385, 769 S.E.2d 1, 3 (2015).  The Act defines a compensable injury as "only injury by accident arising out of and in the course of the employment and shall not include a disease in any form, except when

_____

(Gregory, J., dissenting) (in which the dissent noted that the employee failed to report his injury as work-related and at one point stated the injury was not work-related); *Herndon v. Morgan Mills, Inc.*, 246 S.C. 201, 216, 143 S.E.2d 376, 384 (1965) ("[W]here the subject is one for experts or skilled witnesses alone and concerns a matter of science or specialized art or other matters of which a layman can have no knowledge, the unanimous opinion of medical experts on particular subjects may be conclusive, even if contradicted by lay witnesses.").

[5] Claimant's clinical impression notes and diagnoses (or misdiagnoses) included conditions ranging from "likely brachial plexitis" (Dr. Shaffer) to "right upper extremity pain" and "muscle spasm" (Dr. Tanner) to "mild degenerative disc changes at C5-6 (Dr. Fanning) to "asymptomatic cervical disk bugle [sic] at C5-6 and probably has shoulder pathology on the right of some sort" (Dr. Sweet), to "[r]ight questionable early adhesive capsulitis" and "[r]ight shoulder rotator cuff tendinitis but with adhesive capsulitis" (Dr. McGown), to cervical radiculopathy (Dr. Tanksley, initially) to rhabdomyolysis and deep vein thrombosis.  While some of these diagnoses may have also been applicable to Claimant's condition, all missed the actual injury causing her pain—the rotator cuff tear.  This is somewhat understandable in that Claimant herself did not understand the mechanics of her injury—she just knew she was in pain and could no longer do the lifting required for her job.  As she explained in her deposition, she did not tell the doctors at Providence that she had been hurt at work because at that "particular time, I didn't know what was wrong with me.  I didn't know—all I just know, I was hurting."  Claimant's medical records demonstrate she was consistent about the onset of her pain: she knew where, when, and how it began—she simply did not understand the cause or mechanics of her injury.  Neither did several doctors.

it results naturally and unavoidably from the accident except such diseases as are compensable under the provisions of Chapter 11 of this title." § 42-1-160. An injured employee is not required to identify a specific causal event to prove her injury is compensable. *See Clade v. Champion Labs*, 330 S.C. 8, 12, 496 S.E.2d 856, 858 (1998).

*McGuffin v. Schlumberger-Sangamo*, 307 S.C. 184, 186, 414 S.E.2d 162, 163 (1992), is helpful to our analysis. There, the claimant began to feel a "bad stinging" in her back while picking up a heavy tray at work. *Id.* The claimant initially believed the pain was related to a congenital deformity of her right kidney, which had caused soreness in the past. *Id.* When her pain worsened, the claimant went to the emergency room, and the urologist found her symptoms were consistent with a kidney stone. *Id.* When testing revealed a kidney stone was not the problem, the claimant was treated for muscle strain. *Id.* at 186–87, 414 S.E.2d at 163. As the muscle strain treatment was initially successful, the urologist determined her pain was musculoskeletal. *Id.* at 187, 414 S.E.2d at 163. Five weeks later, an orthopedic surgeon diagnosed the claimant with a lumbosacral strain caused by lifting. *Id.* at 187, 414 S.E.2d at 164. At a hearing before a single commissioner, McGuffin's orthopedic surgeon connected her injury to her work, and this medical evidence was not disputed. *Id.* Thus, the single commissioner awarded the claimant workers' compensation benefits; however, the full commission reversed, relying heavily on the initial erroneous diagnosis and the fact that the claimant "did not immediately attribute her pain to her lifting." *Id.* In reversing the commission, our supreme court noted, "The respondent had been lifting these trays eight to ten times a day for four months without incident. Therefore, it was not unreasonable for her not to make the connection at the time." *Id.* Our supreme court held the claimant's own misdiagnosis was not substantial evidence from which it could be inferred that her injury did not result from an accident at work. *Id.* at 187–88, 414 S.E.2d at 164.

As in *McGuffin*, Claimant's failure to immediately attribute her injury to her work is not fatal to her workers' compensation claim, particularly since several physicians were unable to make a correct diagnosis until some two months after the onset of her symptoms. Claimant consistently reported her right arm and shoulder pain began at work on April 11, and she first sought medical treatment at the emergency room on April 13. It was not until June 11, two months after Claimant's pain began, that Dr. McGown discerned some type of rotator cuff injury. Only later did Claimant realize her injury was related to her job, which involved lifting heavy rolls and sheets of laminating materials. According to Claimant, she told her supervisor in July 2012 that the injury was work-related, and

no evidence was presented to contradict this testimony.  Still, the tear was not discovered until the 2014 surgery.  Based on the record as a whole, most specifically the unequivocal expert opinion of Dr. Mazoue and the chronology of Claimant's reporting to the various doctors who examined her, we find the fact that Claimant did not report that her injury arose from her work until she received the initial shoulder diagnosis is not substantial evidence necessary to support the finding that the injury itself was not work-related.  *See, e.g.*, *id.* (holding employee's misdiagnosis of cause of her back pain did not constitute substantial evidence from which the commission could deduce employee's injury did not result from work-related accident as her treating physician testified).

Notably, the only medical opinion given to a reasonable degree of medical certainty is that of Dr. Mazoue: that the patient's right shoulder injury "most likely occurred on April 10, 2012 (sic), while the employee was engaged in the regular duties of her employment as a laminator lifting heavy rolls."  Although no expert was called to challenge Dr. Mazoue's opinion—or the amended notation of Claimant's other treating physician, Dr. Tanksley—the Single Commissioner found, viewing the evidence "as a whole," he was "not persuaded that the Claimant had an injury by accident on or about 04/10/13 (sic)."  The Appellate Panel's subsequent order affirming the Single Commissioner also recognized "Dr. Mazoue further indicated that there was a direct causal relationship between the condition under which the work is performed and the injury."  And, the Appellate Panel specifically found that in his deposition, "Dr. Mazoue does not change his opinion as to any of the above."

Despite these findings, the Appellate Panel—like the Single Commissioner—declined to give Dr. Mazoue's opinion "normal weight" and instead relied on the medical records of various physicians who misdiagnosed Claimant's rotator cuff injury to reject the only expert opinions addressing causation—those of Dr. Mazoue and Dr. Tanksley.  In the context of the chronology of this case—and absent an expert opinion to the contrary—this was error.

**Conclusion**

We affirm the Appellant Panel's decision as to section 42-1-172 of the South Carolina Code (2015) and repetitive trauma; however, we find the Appellate Panel's findings and conclusions as to section 42-1-160 and the lack of a work nexus are not supported by the substantial evidence in the record and are affected

by errors of law. Thus, we reverse this portion of the Appellate Panel's order and remand this matter for a calculation of benefits.[6]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**WILLIAMS, C.J., and THOMAS, J., concur.**

---

[6] We agree with Employer that Claimant's argument addressing a "dead zone" created by the interaction of sections 42-1-160 and 42-1-172 was first made before this court; therefore, it is not appropriate for our review. *See Miller v. Dillon*, 432 S.C. 197, 207, 851 S.E.2d 462, 467 (Ct. App. 2020) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review." (quoting *Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998))).